**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LAUREN S.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 19-CV-00366** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ANDREW SAUL,** | ) | **Magistrate Judge Jeffrey Cummings** |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant Lauren S. brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security (the "Commissioner") that denied her claim for Disability Insurance Benefits ("DIBs") and Supplemental Security Income under 42 U.S.C. §§416(i) and 423(d) of the Social Security Act (the "Act"). The Commissioner has brought a cross-motion for summary judgment seeking to uphold its decision to deny benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons stated below, Claimant's motion for summary judgment [22] is granted, and the Commissioner's motion for summary judgment [30] is denied.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, only the claimant's first name shall be listed in the caption and we shall refer to Lauren S. as "Claimant." Furthermore, Andrew Saul is now the Commissioner of Social Security and is substituted in this matter pursuant to Fed. R. Civ. P. 25(d).

I.      **BACKGROUND**

    **A.  Procedural History**

On November 10, 2015, Claimant filed a DIBs application pursuant to Title II, alleging a disability onset date of August 18, 2015. (Record ("R.") 105).  Her claim was denied initially on February 18, 2016 and upon reconsideration on July 1, 2016. (R. 116- 25).  On May 12, 2017, Claimant filed an application for supplemental benefits pursuant to Title XVI, and it was transferred directly to the hearing level. (R. 49).  On May 10, 2018, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. (R. 49-62).  The Appeals Council denied review on November 19, 2018, making the ALJ's decision the Commissioner's final decision. (R. 1-3).  *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  Claimant subsequently filed this action in the District Court.

    **B.  Medical Evidence**

    **1.  Evidence from the Medical Records**

Claimant was diagnosed with multiple sclerosis ("MS") in December 2012, and suffered several symptom exacerbations resulting in emergency room visits from 2015 through 2018.  Her neurologist Dr. Michael Schwartz determined that Claimant needed to start immunomodulating therapy[2] as of October 2017. (R. 850-51).  After being admitted to the hospital in April 2016 due

---

[2] Immunomodulating therapy is also known as biological therapy and is "designed to boost the immune system, either directly or indirectly." *See* Immunotherapy Biological Therapy What is biological therapy?, available at: https://www.vidanthealth.com/Services-Treatments/Treatments/Immunotherapy-Biological-Therapy#:~:text=Biological (last visited 7/6/2020).  The use of immunomodulators is a classical form of "treatment of relapsing-remitting multiple sclerosis." *See* Classical Immunomodulatory Therapy in Multiple Sclerosis: How It Acts, How It Works, available at:  https://pubmed.ncbi.nlm.nih.gov/21755136/ (last visited 7/6/2020).

to worsening symptoms, neurologist Dr. Syed Moeed diagnosed Claimant with relapsing-remitting[3] multiple sclerosis ("RRMS") on June 9, 2016. (R. 852).

In February 2015, Claimant reported to the emergency room of Little Company of Mary Hospital and Health Care Centers ("Mary Hospital") with complaints of worsening MS symptoms. (R. 358). On February 3, 2015 she was admitted to Mary Hospital for an "acute exacerbation of her multiple sclerosis." (R. 366, 472). Claimant was treated with a course of steroids and ordered to undergo a brain and spine MRI. (*Id.*). The brain MRI showed "[n]oenhancing white matter abnormalities," thus, Dr. Mary Anthu determined that there was no "presence of active demyelination."[4] (R. 393). The cervical spine MRI showed changes in her T1-T2 and C1-C2 levels, and Dr. Anthu determined this to show that the changes "may be secondary to a new area of demyelination." (R. 395). On July 9, 2015, Claimant was treated at Mary Hospital for an MS exacerbation, was given a prescription for oral steroids, and was discharged home. (R. 450-52). On August 4, 2015, her neurologist Dr. Abid Ali reviewed the July MRIs and determined that Claimant was "stable and unchanged." (R. 470).

On November 2, 2015, Dr. Moeed examined Claimant and noted decreased strength in the "muscles of [her] upper and lower extremities," and that her "[t]andem [gait] was markedly

---

[3] RRMS is defined as a form of "MS in which patients have relapses of MS and periods of stability in between relapses. Relapses are episodes of new or worsening symptoms not caused by fever or infection and that last more than 48 hours." Although symptoms of RRMS vary, the following symptoms have been identified as frequent early signs: "[e]pisodes of visual loss in one or the other eye, [t]ingling or numbness, [d]ouble vision, fatigue, [u]rinary urgency, [b]alance problems, [w]eakness. *See* Relapsing Remitting MS (RRMS): Multiple Sclerosis, available at: https://my.clevelandclinic.org/health/diseases/14905-ms-relapsing-remitting-multiple-sclerosis-rrms#:~:text=Relapsing-remitting (last visited July 6, 2020).

[4] Demyelinating disorders cause damage to myelin which causes scar tissue on the brain, and due to the presence of the scar tissue, the normal course of signals traveling from the brain to the nerves is disrupted. MS is the most common demyelinating disorder, and a person suffering from MS usually experiences "extreme fatigue, vision problems, trouble moving, tingling, burning, or other odd feelings." *See* Demyelinating Disorders: Types, Causers, Symptoms, Treatments, available at: https://www.webmd.com/multiple-sclerosis/what-are-demyelinating-disorders (last visited July 6, 2020).

impaired." (R. 477). Claimant underwent a cervical spine MRI in July 2015, and Dr. Griffin determined that there were no signs to "suggest progression or active demyelination." (R. 486). Claimant also underwent a brain MRI, and Dr. Griffin determined that there was "[n]o significant change from February 3, 2015." (R. 488).

Claimant went to see Dr. Satinder Dalawari on April 26, 2016, to establish a primary care physician relationship. (R. 531). Dr. Dalawari noted that Claimant had a history of MS, bipolar and anxiety disorder, and that she felt as though her MS was getting worse. (*Id.*). After performing a physical examination, Dr. Dalawari recommended that she be admitted to the hospital "for an evaluation and further management." (R. 532).

On April 27, 2016, Claimant was admitted to Advocate Christ Medical Center ("Advocate") for an MS exacerbation. (R. 498, 852). Claimant reported that for the past month she had been having increasing numbness in her lower extremities, "tingling, difficulty walking along with left upper extremity numbness." (R. 499). On physical examination, she was found to have normal strength in her upper extremities, and slightly decreased strength in her lower extremities. (R. 500). She was also found to have trouble balancing and performing tandem gait. (*Id.*). Claimant underwent brain and spine MRIs during her stay at Advocate. (R. 500, 868-71). The brain and cervical spine MRIs showed "[n]o abnormal postcontrast enhancement to suggest foci of active demyelination." (R. 868, 870). The thoracic spine MRI showed evidence of prior demyelination, but "no evidence of active demyelination." (R. 871). Based on the above, Dr. Padmaja Gutti diagnosed Claimant with a MS exacerbation and worsening gait, and he treated Claimant with a three day course of steroids. (R. 500).

After her discharge from Advocate, Claimant next saw Dr. Dalawari on May 16, 2016 for a follow-up, and continued to treat with him every four months thereafter. (R. 528-30). During

her visit with Dr. Dalawari on September 13, 2016, Claimant reported feeling that "her MS is getting worse," and that she suffers from "[a] lot of pain on the back from neck to the lumbar area." (R. 525). Subsequently on September 28, Claimant was admitted to Mary Hospital for a MS exacerbation and unsteady gait. (R. 620). She was treated with a three day course of steroids and was discharged on October 1, 2016. (*Id.*). During her stay at Mary Hospital, she underwent a neurologic examination by Dr. Schwartz, who determined she was suffering a MS exacerbation and advised Claimant to consider starting immunomodulating therapy. (R. 662-63).

On November 22, 2016, Claimant was examined by Dr. Dalawari, and she complained of lower abdominal pain; she was diagnosed with diverticulitis of the large intestine and was prescribed Cipro and Flagyl. (R. 522-23). Claimant returned to see Dr. Dalawari on November 29, with complaints of continued "abdominal pain and black stools." (R. 519). After performing a physical examination, he recommended that Claimant be admitted to the hospital. (R. 521).

The record shows that Claimant was admitted to Mary Hospital on April 26, 2017, and underwent IV infusion to treat her MS symptoms. (R. 600-03). Dr. Dalawari examined Claimant on June 29, 2017, and noted that neurologically she was "grossly normal," but he did note that she had "skin lesion on both legs." (R. 509). He referred Claimant to a dermatologist for evaluation of the lesions. (R. 510). On October 9, 2017, Dr. Schwartz examined Claimant and determined that she had "increased nystagmus,"[5] "spastic ataxia"[6] in her lower extremities,

---

[5] Nystagmus is defined as a jerky motion occurring in the eyes that causes the inability "to fixate a point at the limits of the field of fixation." *See* https://medical-dictionary.thefreedictionary.com/end-point+nystagmus (last visited July 6, 2020); *see also*, Nystagmus: Symptoms, Causes, Diagnosis, Treatment, available at: https://www.webmd.com/eye-health/nystagmus#1 (last visited July 6, 2020).

[6] Spastic ataxia is defined as "an aspect of ataxia, in which the ability to control the distance, power, and speed of an act is impaired." *See* https://medical-dictionary.thefreedictionary.com/dysmetria (last visited July 6, 2020).

"slight dysmetria,"[7] and that she can only "walk with standby assistance, with significant spastic ataxia." (R. 851). Dr. Schwartz again recommended initiating immunomodulating therapy, and noted that Claimant will continue to use "medical marijuana to help with significant lower extremity pain and stiffness." (*Id.*).

On October 28, 2017, Dr. Dalawari examined Claimant who complained of worsening MS symptoms and anxiety. (R. 919). He noted significantly decreased strength in her lower extremities (worse on the left), skin lesions on both legs, that she was "wheelchair bound" and recommended that she be admitted to the hospital for further evaluation. (R. 920). Claimant was admitted to Mary Hospital on October 29, 2017 for a MS exacerbation. (R. 908-14). On November 1, 2017, Claimant underwent MRIs on her brain and thoracic and cervical spine.[8] (R. 887-92).

The MRI of her thoracic spine was compared to a prior one from January 2013, and Dr. Melissa Rooney determined that there was evidence of worsening abnormalities that suggest "prior demyelination and [disease] progression." (R. 887-88). The MRI of her cervical spine was compared to a prior one from February 2015, and was found to be similar. (R. 889). The brain MRI was compared to a prior one performed in January 2014, and Dr. Rooney determined that it showed evidence of prior demyelination and "overall mild progression." (R. 892). Dr.

---

[7] Dysmetria is described as "a heterogeneous group of progressive neurodegenerative disorders, characterized by lower-limb spasticity and generalized ataxia with dysarthria, impaired ocular movements, and gait disturbance." *See* MalaCards integrated aliases for Spastic Ataxia, available at: https://www.malacards.org/card/spastic_ataxia#:~:text=KEGG%20%3A%2036%20Spastic%20ataxia%20(SPAX,mitochondrial%20factors%20cause%20this%20disease. (last visited July 22, 2020).

[8] Claimant argued that these MRIs were not reviewed by the agency's doctors, and without stating more reaches the conclusion that this means "the ALJ interpreted this medical evidence on her own." (Dckt. #22 at 15). However, as explained above, the MRIs include the doctor's impressions and this is what the ALJ summarized. Summarizing the doctor's impressions does not equate to the ALJ playing doctor or interpreting medical evidence on her own. *Brown v. Barnhart*, 298 F.Supp.2d 773, 791 (E.D. Wis. 2004); *see, e.g., Michael B. v. Berryhill*, No. 18 C 236, 2019 WL 2269962, at *7 (N.D. Ill. May 28, 2019) (finding that an ALJ did not play doctor by citing to an MRI and summarizing the Radiologist's conclusions).

Rooney determined that none of the MRIs taken on November 1st showed evidence of "an active demyelinating process." (R. 888, 890, 892).

Dr. Dalawari examined Claimant on November 20, 2017, and noted that she was "wheelchair bound" and that she suffered from "paraplegia[9]," and started Claimant on tramadol[10] and gabapentin. (R. 904-06). On April 7, 2018, Claimant was admitted to Advocate for a MS flare-up and was treated with a five day course of steroids. (R. 12). She was discharged on April 13, 2018, and advised to follow-up with her primary care physician. (R. 13). Claimant was also started on protonix and miralax, and she was instructed to continue taking vitamin D3, clonazepam, folic acid, gabapentin, magnesium oxide, methimazole, oxybutynin, and tramadol. (R. 13-14). An MRI of her brain was performed during her stay, and showed findings consistent with Claimant's history of MS, but "[n]o area of enhancement to suggest active demyelination." (R. 41-42). Claimant also underwent an x-ray of her left hip which showed "no significant abnormalities." (R. 44-45).

The record also contains a physical functional assessment devised by Dr. Dalawari on August 11, 2016. (R. 495). Although, the document is very small and the majority of it is hard to read, Dr. Dalawari's name and signature are clearly displayed on the document. Dr. Dalawari opined that Claimant can never climb ramps, stairs, ladders, or ropes; never stoop, kneel, crouch or crawl; occasionally reach overhead; and frequently perform fine and gross manipulation. (*Id.*).

---

[9] Paraplegia is characterized as a form of "paralysis [that] affects all or part of the trunk, legs and pelvic organs." *See* Spinal cord injury, available at: https://www.mayoclinic.org/diseases-conditions/spinal-cord-injury/symptoms-causes/syc-20377890 (last visited July 22, 2020).

[10] Tramadol is a narcotic that is "used to relieve moderate to moderately severe pain." *See* Tramadol (Oral Route), available at: https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050 (last visited July 22, 2020).

### 2.  Evidence from Agency Consultants

On January 22, 2016, Dr. Erika Gilyot-Montgomery reviewed Claimant's medical records and formulated an opinion regarding her mental health. (R. 106-8).  Claimant stated that in addition to MS she suffered from bipolar disorder, anxiety and panic attacks. (R. 104).  Dr. Gilyot-Montgomery found that "[t]here [was] insufficient evidence to substantiate the presence of a disorder." (R. 107).  Further, Dr. Gilyot-Montgomery opined that although Claimant's medical records showed that she had a history of bipolar and depression disorder, there was no documentation showing that she was prescribed any "psych meds for mental impairment," and that "there [were] no [records] from any mental health or psychiatric treating source." (R. 108).

Dr. Yong-Ja Kim devised a physical functional assessment of Claimant's ability to perform substantial gainful activity. (R. 108-11).  Dr. Kim opined that Claimant suffered from exertional limitations; and determined that she could occasionally lift and carry 10 pounds and could frequently lift and carry less than 10 pounds, stand and walk for two hours, sit more than 6 hours, and could pull or push any amount of weight. (R. 109).  Dr. Kim explained that these exertional limitations were based on the fact that Claimant's last MS flare-up occurred on July 9, 2015, neurological exams "within normal limits," Dr. Moeed's July 20, 2015 treatment record, and Dr. Ali's November 2, 2015 treatment record. (*Id.*).  In addition, Dr. Kim determined that Claimant did not suffer from any postural limitations. (*Id.*).  Ultimately, Dr. Kim found Claimant to have the ability to perform work at the sedentary level and opined that she was not disabled. (R. 110).

On reconsideration, Dr. Tyrone Hollerauer's mental health opinion was the same as Dr. Gilyot-Montgomery, in that he found "[t]here [was] insufficient evidence to substantiate the presence of a disorder." (R. 116).  On June 29, 2016, Dr. Phillip Galle devised a physical

functional assessment of Claimant's abilities and also determined that she suffered from exertional limitations and agreed with Dr. Kim's opinion on this point. (R. 119). Unlike Dr. Kim, however, Dr. Galle found Claimant to suffer from postural limitations. (*Id.*). Dr. Galle found that due to Claimant's history of MS she could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch and crawl. (*Id.*). Further, he opined that she "needed to avoid concentrated exposure to hazards." (R. 120). Dr. Galle opined that based on his assessment, Claimant was not disabled. (R. 121).

### C. Evidence from Claimant's Testimony

On January 29, 2018, Claimant testified at a hearing before an administrative law judge ("ALJ"). (R. 68-103). She testified that she filed for disability due to her "progressive symptoms of MS." (R. 80). Specifically, Claimant stated that she stopped working due to feeling "very fatigued," and being unable to "stand for long periods." She informed that at that time she could "barely stand for 15 minutes at a time." Further, Claimant explained that she had trouble handling money and "stocking stuff" due to "issues with [her] hands." (R. 80).

Claimant explained that due to MS she is unable "to walk and get dressed by [her]self," feels "a lot [more] fatigued," and has to take three (2-3 hour) naps a day." (R. 80-1). She testified that on a typical day she would "wake up, use the bathroom, maybe feed [the] dog if [she] has the energy, and normally just lay in bed all day." (R. 81). Further, she explained that she does not normally cook, and that her dad brings her food upstairs. (*Id.*) Additionally, her boyfriend helps her take a shower, but she also has a showering chair to assist her. (R. 82).

Further, Claimant reported that when she experiences a MS exacerbation her legs are affected first; "get weak in [her] knees, fall[s] a lot" and can barely stand up (*Id.*). Also, she explained that her symptoms are "pretty much the same [when not experiencing an exacerbation]

because although [she is] not having the flare, [she] still experience[s] the symptoms of the
flare." (R. 83). Claimant also reported that she has incontinence issues, and had been wearing
adult diapers for the past eight months. (*Id.*). She was also using a wheelchair during the
hearing, and stated she decided to get it even though she did not have a prescription from her
doctor. (R. 83-4).

Additionally, Claimant testified that she has issues sitting upright for long periods of time
and "gets very tired." (R. 85). She explained that she can only sit for 10 minutes before she
needs to switch positions. (R. 86). Claimant explained that her symptoms vary, that on a good
day she can get out of bed by herself and sit in the shower chair to bathe. (R. 86). On a bad day,
however, she would require help to get out of bed, get undressed and to take a shower. (R. 87).
Lastly, she explained that she has approximately "five or four" bad days in a week. (*Id.*).

**D. Vocational Expert's Testimony**

The Vocational Expert ("VE") reported that Claimant had relevant past work as a cashier
and that her prior work had been performed at the medium and light exertional level. (R. 98).
After the ALJ explained the hypothetical person, the VE testified that sufficient jobs existed at
the sedentary exertional level (*e.g.*, call out operator, address clerk and telephone quotation
clerk). (R. 99). The VE explained that use of a cane to ambulate would not impact the
availability of any of these jobs. (R. 100). If the person needed to use a wheelchair, however,
then all of these jobs would be "rule[d] out." (*Id.*). The VE elaborated that to perform these jobs
the person will "have to be able to walk for two hours and lift 10 pounds and she wouldn't be
able to do that if she's in a wheelchair. (*Id.*). Further, the VE testified that if a person required an
extra one hour break in addition to her lunch and two 15 minutes breaks, that person would not

be able to "perform a sedentary job." (*Id.*). Lastly, the VE explained that this person could only be absent one day per month, "[a]nything over that wouldn't allow work." (R. 101).

## E. The ALJ's Decision

On May 10, 2018, the ALJ issued a decision finding Claimant not disabled. (R. 62). Applying the five-step sequential evaluation that governs disability cases, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity since her alleged onset date of August 18, 2015. Her severe impairments at Step 2 were multiple sclerosis, diverticulitis and chronic obstructive pulmonary disease ("COPD"); and her non-severe impairments were hiatal hernia, left big toe fracture, anxiety, bipolar disorder and cannabis abuse disorder. (R. 52). The ALJ determined at Step 3 that none of Claimant's impairments met or medically equaled a listed impairment – either singly or in combination with one another. (R. 55).

Prior to moving to Step 4, the ALJ determined that the record did not fully support Claimant's statements regarding the restrictions imposed by her symptoms. (*Id.*). The ALJ further found that Claimant had the RFC to perform sedentary work as that exertional level is defined in 20 C.F.R. § 404.1567(a). The ALJ, however, added the following restrictions: "no working around unprotected heights, open flames, or dangerous moving machinery; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stopping, kneeling, crouching and crawling; no concentrated exposure to dusts, fumes, gases, or poor ventilation; and use of cane to ambulate." (R. 56). Based on these conclusions, the ALJ determined at Step 4 that Claimant could not perform any of her past relevant work. (R. 60). At Step 5, the ALJ determined that a sufficient number of jobs existed in the national economy that a person with Claimant's RFC could perform. (R. 61-2).

11

## II.    LEGAL ANALYSIS

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520(a).

The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i).  It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii).  At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings").  The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's RFC, which defines his or her exertional and non-exertional capacity to perform work.  The SSA then determines at step four whether the claimant is able to engage in any of his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can do so, he or she is not disabled. *Id.*  If the claimant

cannot undertake his or her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of his or her RFC, age, education, and work experience.  Under this standard, an individual is not disabled if he or she can perform work that is available. 20 C.F.R. § 404.1520(a)(4)(v).

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983).  A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence.  *Elder*, 529 F.3d at 413 (citation omitted).

## III.    DISCUSSION

Claimant argues that the Commissioner's decision should be reversed and remanded for several reasons including because the ALJ improperly discounted Claimant's treating physician's

opinion, applied the wrong evidentiary standard when analyzing Claimant's subjective complaints about intensity and persistence of her symptoms, and wrongly determined Claimant's RFC. (Dckt. #22). Although the Commissioner disputes Claimant's arguments on these points, the Court finds that this case must be remanded for the reasons explained below.

### A. The ALJ Erred By Discounting Claimant's Treating Physician's Opinion Without Discussing The Pertinent Regulatory Factors

A treating physician's opinion that "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is consistent with other substantial evidence contained in the record is entitled to controlling weight. 20 C.F.R. §404.1527(c)(2); *Meuser v. Colvin,* 838 F.3d 905, 912 (7th Cir. 2016). If the ALJ decides not to assign controlling weight to the treating physician's opinion, then she must explain the basis of her reasoning by addressing the factors outlined in 20 C.F.R. §404.1527(c)(2) for claims – like the one at issue here – that were filed prior to March 27, 2017. *Kaminski v. Berryhill*, 894 F.3d 870, 874 n.1 (7th Cir. 2018). The purpose of the regulatory factors is to guide the ALJ's reasoning when deciding what amount of weight to assign to the treating physician's opinion. *See Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) (noting that when an ALJ fails to discuss the regulatory factors, a reviewing court "cannot assess whether she appropriately" determined how much weight to assign). As the Seventh Circuit has made clear, ALJs "must consider" these factors (namely, "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion") when discounting a treating physician's opinion. *Larson v. Astrue*, 615 F.3d 744, 750–51 (7th Cir. 2010) (citing cases).

In this case, the ALJ noted under her RFC assessment that she "also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927." (R. 56). The ALJ then found that:

> [l]ittle weight also goes to Exhibit 4F. Much of the document is illegible[11] – e.g., it is unclear whether it even applies to the claimant. Additionally, the record supports fewer long-term limitations. For example, the above-outlined clinical record generally does not reflect problems with sitting, and the claimant's range of motion findings have usually been unremarkable (See e.g. 8F/5; 9F/73, 185; 12F/8; See generally 3A). The conservative treatment history outlined above, and admitted activities like driving, are also not commensurate with this assessment. For example, if the claimant was "never" capable of stooping, than [sic] she would not be capable of getting out of her bed much less driving, shopping, or attending the disability hearing.

(R. 60). The Commissioner believes that it was sufficient for the ALJ to state that Dr. Dalawari's opinion was inconsistent with treatment records, and cites to a Seventh Circuit decision to support its argument that "an ALJ need not explicitly state how she weighed every factor." (Dckt. #31 at 4). It is true that the Seventh Circuit held that although an ALJ did not expressly discuss each factor, it was sufficient for her to "note the lack of medical evidence supporting [the treating physician's] opinion." *Henke v. Astrue*, 498 Fed.Appx. 636, 641 (7th Cir. 2012). This decision, however, was non-precedential[12], and the Seventh Circuit has since reaffirmed that discussion of the regulatory factors is required upon the discounting of a treating physician's opinion. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014); *Kaminski*, 894 F.3d at 874 n.1; *Scrogham*, 765 F.3d at 697-98.

---

[11] Claimant argued that the ALJ should have requested a clearer copy upon her discovery that the document was too hard to read, and the Commissioner responds that it is Claimant's burden to provide medical evidence to support her claim. (Dckt. #31 at 3). While the Commissioner is correct, this is a moot issue since the document was admitted into evidence, and the ALJ both discussed the portions she was able to read and weighed Dr. Dalawari's opinion.

[12] In any event, *Henke* does not even mention, let alone purport to overrule, any of the prior precedential decisions that require the discussion of the regulatory factors. *See, e.g., Larson*, 615 F.3d at 750–51; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

In this present matter, the ALJ granted Dr. Dalawari's opinion "little weight" because "the record supports fewer long-term limitations." (R. 60). She next provides a few examples of how the record supports such less restrictive limitations; however, nowhere in her decision does the ALJ make clear to this Court that she considered the regulatory factors when determining what weight to assign to Dr. Dalawari's opinion. Like in *Scrogham*, this Court "cannot assess whether she appropriately chose not to give much weight" to Dr. Dalawari's opinion. *Scrogham*, 765 F.3d at 697-698. The best way for an ALJ to make it clear to a reviewing court that she considered the regulatory factors, would be to explicitly discuss them in her decision as the Seventh Circuit has instructed. *Moss*, 555 F.3d at 561.

The ALJ's determination that Dr. Dalawari's opinion is inconsistent with the record as a whole because the medical records show Claimant "as unremarkable or as displaying fewer problems than alleged in terms of her strength, reflexes, sensation, gait, skin, joint, range of motion. . ." (R. 58), is, in fact, contradicted by the record. In particular, the medical records from mid-2016 through 2017 show evidence of Claimant's unsteady gait, skin rashes or lesions, and decreased strength in lower extremities and signs of dysmetria in her upper extremities. (R. 620-914). The medical records further reflect that: (1) Claimant is "wheelchair bound" and suffering from "paraplegia" (R. 904-06); (2) Claimant's medical treaters recommended that Claimant start taking stronger medication to manage her MS symptoms (R. 662-63, 851); and (3) Claimant was experiencing a progression in the course of her disease. (R. 887-92). In light of this evidence, it is certainly possible that had the ALJ discussed the regulatory factors, she may have determined that Dr. Dalawari's opinion was entitled to greater weight. *See Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (determining that "[p]roper consideration of these factors may have caused the ALJ to accord greater weight" to the treating physician's opinion); *see, e.g., Michael C. v.*

*Saul*, No. 19-CV-002173, 2020 WL 2526481, at *5 (N.D.Ill. May 15, 2020) (finding that had the ALJ discussed the regulatory factors she might have weighed the treating physician's opinion differently).

In sum: the ALJ's decision does not make it clear that any of the regulatory factors were considered when she was determining what weight to assign to Dr. Dalawari's opinion. *Campbell*, 627 F.3d at 308; *See Jeske v. Saul*, 955 F.3d 583, 593 (7th Cir. 2020) (noting that treating physicians' opinions can only be "rejected with 'an accurate and logical bridge' between the evidence and the ALJ's decision"). Since Seventh Circuit precedent requires ALJs to discuss the factors outlined in 20 C.F.R. §1527(c)(2) whenever they discount a treating physician's opinion, this case must be remanded to enable the ALJ to engage in the requisite analysis.

### B. The ALJ's Flawed RFC Assessment Requires Remand

While the task of assessing a claimant's RFC is reserved to the Commissioner and not a medical expert, an ALJ must utilize "all of the relevant medical and other evidence" in the record to assess a claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). The Seventh Circuit has held that an "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); *see also* SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996) (stating that an "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific facts [] and nonmedical evidence [].").

Furthermore, an ALJ "must also explain how any material inconsistencies or ambiguities in the evidence [] were considered and resolved," SSR 96-8P, 1996 WL 374184, at *7, and the Seventh Circuit has made it clear that cherry-picking through the evidence contained in the

record and ignoring evidence that proves disability is reversible error. *Briscoe ex rel. Taylor*, 425 F.3d at 352; *Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."); *Scrogham*, 765 F.3d at 698-99 (finding that the ALJ improperly only selected evidence in the record "that supported her conclusion that Mr. Scrogham was not disabled" and ignored contradictory evidence.); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

In this present case, the ALJ's RFC assessment fails to adhere to the above standards and requires that this case be remanded for a proper determination for the following reasons.

### 1. The ALJ Must Explain Her RFC Findings By Citing To Specific Objective Medical Evidence.

First, the ALJ did not explain how she determined the exertional and postural limitations that are applicable to Claimant, and "this omission in itself is sufficient to warrant reversal of the ALJ's decision." *Briscoe ex rel. Taylor*, 425 F.3d at 352; *see, e.g., Mark J. v. Saul*, No. 18 C 8479, 2020 WL 374676, at *5 (N.D. Ill. Jan. 23, 2020) (instructing that "an ALJ cannot reject all the relevant medical RFC opinions and then, "construct [] a 'middle ground' and c[o]me up with her own physical RFC assessment' without logically connecting the evidence to the RFC findings.") (citing cases). As in *Suide v. Astrue*, 371 Fed.Appx. 684 (7th Cir. 2010), at 690, there is an "evidentiary deficit left by the ALJ's rejection" of Dr. Dalawari's opinion. Yet even more troubling here, the ALJ granted limited weight to the agency consultative doctors' opinions and there is no discussion of any greater weight being assigned to any other medical opinion contained within the record. This Court finds that the "rest of the record simply does not support

the parameters included in the ALJ's residual functional capacity determination." *Id.*; *Scrogham*, 765 F.3d at 698.

### 2. The ALJ Cannot Simply Ignore Evidence That Supports A Finding Of Disability

Second, the ALJ did not address evidence that supported a finding of disability. *Briscoe ex rel. Taylor*, 425 F.3d at 352; *Stephens*, 888 F.3d at 329. The record shows that Claimant was diagnosed with RRMS. This form of MS causes relapsing episodes that last over 48 hours at a time, and there are numerous medical records showing that Claimant had to be admitted to the hospital due to a relapse and stayed for more than two days. (R. 12, 366, 450-52, 472, 498, 500, 620, 662-63, 852, 908-14). The ALJ, however, never mentions that Claimant was diagnosed with RRMS and is vulnerable to suffering these relapsing episodes. Furthermore, the diagnosis of RRMS supports Claimant's subjective statements about the intensity and persistence of her symptoms. Instead the ALJ finds that the record shows evidence "of temporary worsening and improvement with treatment," and that the "efficacy of this treatment history supports better controlled and/or lower-level long-term symptoms than alleged." (R. 58). This finding is inconsistent with the diagnosis of RRMS and with Claimant's medical records from 2016 through 2018. This omission is troubling because the VE testified that there would be no work available at the sedentary level if Claimant is absent more than one day a month, and patients diagnosed with RRMS will suffer periodic relapse episodes lasting more than 48 hours. (R. 100).

Additionally, the record shows that Claimant is now using a wheelchair, however, the ALJ dismisses this because it was not prescribed by a doctor. Specifically, the ALJ determined none of Claimant's doctors "objectively confirm[ed] that she actually needed any such device." (R. 59). In addition, the ALJ reasoned that Claimant required use of a wheelchair due to her toe fracture injury even though none of Claimant's doctors stated such a conclusion in their

treatment records. (*Id.*). To the contrary, Dr. Dalawari noted that Claimant was wheelchair bound and suffering from paraplegia. (R. 904-06). It is well settled in this Circuit that lack of a prescription is not a proper ground for disbelieving that Claimant requires use of the assistive device. *Terry v. Astrue*, 580 F.3d 471, 477-79 (7th Cir. 2009); *see, e.g., Jason S. v. Saul*, No. 18 C 8371, 2020 WL 291381, at *5 (N.D.Ill. Jan. 21, 2020). The VE testified that if Claimant was in a wheelchair, there would be no work available. (R. 101). In the face of the above evidence, the ALJ's failure to explain how her finding that Claimant only needs a cane to ambulate is supported by specific medical evidence was an error.

### 3. The ALJ Erred By Relying On Outdated Medical Assessments That Did Not Consider Any Of Claimant's More Recent Medical Records

Lastly, although the ALJ explained that she granted the state agency doctors' opinions little or limited weight because their assessments were based on earlier medical records (R. 55, 59-60), the ALJ's RFC follows Dr. Galle's functional assessment verbatim – except for the determination that Claimant can balance occasionally. (R. 119-20). According to Dr. Galle, Claimant's last flare-up was in July 2015 but this is incorrect: Claimant was admitted to the hospital in April 2016 for MS exacerbation. (R. 498). Thus, even though Dr. Galle's report was prepared in June 2016, it is apparent that he did not review any post-2015 medical records because he would have noted Claimant's April 2016 hospitalization if he had.

It is well settled that "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018); *see Mary P. v. Berryhill*, No. 17-CV-06545, 2019 WL 2491640, at *7–8 (N.D. Ill. June 14, 2019) (instructing the ALJ to "submit all the medical evidence to the state agency physicians for further review and scrutiny before making a

determination that relies on their opinions"). In this present case, it is possible that consideration of the fact that Dr. Galle (who reviewed Claimant's medical records only through 2015) and whose determination did not factor in the more recent medical records could change the ALJ's decision to rely on his opinion rather than Dr. Dalawari's (whose opinion factored in more recent medical findings, and is supported by his later treatment records). The ALJ is directed to explore this issue on remand.

## CONCLUSION

For the reasons stated above, Claimant's motion for summary judgment [22] is granted. The Commissioner's cross-motion for summary judgment [30] is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall (1) determine if Dr. Dalawari's opinion should be granted controlling weight, if not, she shall discuss the regulatory factors in assigning lesser weight; and (2) reassess Claimant's RFC assessment with consideration of all relevant medical evidence.

**ENTERED:**

_____

**Jeffrey I. Cummings**
**United States Magistrate Judge**

**Dated: August 3, 2020**